**ROYAL THAI GOVERNMENT, Sahaviriya Steel Industries Public Company Limited, Plaintiffs,**

v.

**UNITED STATES, Defendant,**

and

**United States Steel Corp., Defendant–Intervenor.**

Slip Op. 07–119.
Court No. 02–00026.

United States Court of International Trade.

Aug. 6, 2007.

Vinson & Elkins LLP (Kenneth J. Pierce, Robert Edward DeFrancesco, and Victor S. Mroczka) for Plaintiffs the Royal Thai Government and Sahaviriya Steel Industries Public Company Limited.

Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Claudia Burke and David S. Silverbrand); Mykhaylo A. Gryzlov, International Attorney–Advisor, Office of the Chief Counsel for the Import Administration, United States Department of Commerce, for Defendant United States.

Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DC (John J. Mangan) for Defendant–Intervenor United States Steel Corporation.

## OPINION

GOLDBERG, Senior Judge.

This matter is before the Court following a court-ordered remand on July 26, 2006. See *Royal Thai Gov't v. United States*, 30 CIT ——, 441 F.Supp.2d 1350 (2006) ("*Royal Thai III*").

## I. BACKGROUND

### A. Procedural History of This Case

In December 2000, Commerce initiated an investigation into whether the Thai steel industry received various countervailable subsidies. See *Certain Hot–Rolled Carbon Steel Flat Products from Argentina, India, Indonesia, South Africa, and Thailand*, 65 Fed.Reg. 77580 (Dep't Commerce Dec. 12, 2000) (notice of initiation of countervailing duty investigation). At the conclusion of this investigation, Commerce determined *inter alia* that the Royal Thai Government ("RTG") provided countervailable subsidies to the Thai steel industry in the form of import duty exemptions under Sections 30 and 36(1) of the Investment Promotion Act of 1977 ("the duty exemption programs"). See *Certain Hot–Rolled Carbon Flat Products from Thailand*, 66 Fed.Reg. 50410 (Dep't Commerce Oct. 3, 2001) (final results of countervailing duty investigation). The duty exemption programs permitted Thai steel manufacturers to import free of duty charges raw materials consumed in production and raw materials incorporated into goods for export. *See* Issues and Decision Memorandum in the Final Affirmative Countervailing Duty Determination: Certain Hot–Rolled Carbon Steel Flat Products from Thailand, C–549–818 (Sept. 21, 2001), Parts II.A.2 & II.A.3, *available at* http://ia.ita.doc.gov/frn/summary/thailand/01–24753–1.txt ("Issues and Decision Mem."). Ultimately Commerce calculated the benefit from the duty exemption programs by using a 1% benchmark rate and found, respectively, 0.58 percent and 0.07 percent countervailable subsidy rates. *See id.*

Two court cases were filed challenging the final results of the investigations. These cases were later consolidated. In one case, Plaintiffs RTG and Sahaviriya Steel Industries Public Company Limited ("SSI") challenged Commerce's decision to countervail the entire amount of the duty exemption programs. Compl. ¶ 12 (Court No. 02–00027). In the other case, domestic party United States Steel Corp. ("U.S.Steel") objected to Commerce's use of the 1% tariff rate as a benchmark to measure the benefit from the duty exemption programs.[1] Compl. ¶ 13 (Court No. 02–00026). Specifically, U.S. Steel argued that the 1% rate was itself a countervailable subsidy and therefore an inappropriate benchmark. *See* U.S. Steel's Mem. Support Mot. J. Agency Record 43–44.

This Court ordered Commerce to reverse its decision to countervail the entire amount of the duty exemptions. *See Royal Thai Gov't v. United States*, 29 CIT ——, 341 F.Supp.2d 1315 (2004) ("*Royal Thai I* "). As a result, U.S. Steel's argument relating to the benchmark was moot. *See id.*, 29 CIT at ——, 341 F.Supp.2d at 1326. The U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") reversed *Royal Thai I's* holding and upheld Commerce's decision to countervail the entire amount. *See Royal Thai Gov't v. United States*, 436 F.3d 1330, 1337–41 (Fed.Cir.2006) ("*Royal Thai II* ").

After *Royal Thai II*, the only thing remaining for this Court to do with respect to the duty exemption programs was to address U.S. Steel's challenge to the 1%

benchmark. Commerce initially had found that since a 1% rate would have applied to the steel slab imports, that 1% rate was the correct benchmark to use. *See* Issues and Decision Mem. Parts II.A.2 & II.A.3. The Court remanded that matter back to Commerce, explaining that the countervailing duty laws required Commerce to use a noncountervailable benchmark. *See Royal Thai III*, 30 CIT at ——, 441 F.Supp.2d at 1364–68. The Court then instructed Commerce to determine whether the 1% rate it had initially used in calculating the benefit of the duty exemptions was itself a countervailable subsidy. *See id.*, 30 CIT at ——, 441 F.Supp.2d at 1368.

**B. Commerce's May 4, 2007 Remand Determination**

A component of countervailability analysis is specificity; a subsidy is only countervailable if it is a *specific* subsidy. *See id.* at 1366 (discussing 19 U.S.C. § 1677(5A)(D)'s de facto specificity requirement). A de facto specificity analysis will require Commerce to examine the actual "use" of the subsidy and the "amount" of the subsidy that various industries received.[2] *See* 19 U.S.C. § 1677(5A)(D)(iii) (2000). In order to compare the "use" and "amount" of the 1% rate across various Thai industries, the RTG claimed on remand that the specificity analysis should examine the relative benefits resulting from the 1% rate. The RTG proposed that Commerce calculate the duty savings resulting from the 1% rate by subtracting the duties actually paid on merchandise

---

1. Other domestic parties jointly commenced this case with U.S. Steel, but at this point in the proceedings all other domestic plaintiffs have ceased involvement with the litigation and only U.S. Steel remains.

2. A subsidy is specific under 19 U.S.C. § 1677(5A) if it is de facto or de jure specific. No party to this litigation has ever argued that the 1% rate could be de jure specific. Instead, the litigation has focused on whether the 1% rate is de facto specific.

subject to the 1% rate from what would have been paid otherwise. The RTG proposed further that the "Normal" rates be used to calculate the import duties that would otherwise be due. According to the nomenclature of the Thai tariff system, the "Normal" rates were higher than the "Reduced" rates. *See Verification Report 3–5.* During the period of investigation, steel slab had a 1% "Reduced" rate and a 10% "Normal" rate. *See* RTG's Supp. Quest. Resp. 6.

Commerce rejected the RTG's proffered "relative benefit analysis," insisting that it was inappropriate to use the "Normal" rates as benchmarks in calculating the precise amount of benefits flowing from the 1% rate.[3] *See Results of Redetermination on Remand Pursuant to Royal Thai Government, et al. v. United States, Slip Op. 04–91 (Ct Int'l Trade July 27, 2004)* (May 4, 2007) at 7 & 18–19 *("Remand Determination")*.[4] Commerce explained that the "Normal" rates were unsuitable benchmarks because the "Normal" rates in the Thai tariff system "are not usually applied in assessing duties upon imports under the vast majority of the HTS categories." *Id.* at 18. Commerce explained further that

the RTG implemented "Normal" rates as part of Thailand's negotiations with the WTO to fulfill its obligations to cap its import duties at certain agreed-upon levels. *Id.*

The *Remand Determination* reflects Commerce's understanding that the "Normal" rates were generally used as a form of import protection, and were only applied to imports competing with domestic industries specifically targeted for protection. *Id.* at 18–19. According to Commerce, they served merely to memorialize Thailand's GATT and WTO commitments in the Thai HTS and were irrelevant for purposes of the actual assessment of duties for the vast majority of HTS designations receiving the 1% rate. Commerce reasoned that since the "Normal" rates would under no circumstances have been applied, it made no sense to use them as benchmarks.[5]

Instead, Commerce analyzed specificity by measuring the total CIF values[6] of imported merchandise under the various HTS subheadings receiving the 1% rate. Relying on the data culled from the total CIF value analysis, it then made a twofold

---

3. For sake of clarity, it may be helpful to provide some explanation of the two types of benchmarks at issue in this case. First, Commerce must select a benchmark to calculate the economic value of the duty exemption programs. Originally, Commerce had determined the 1% rate was an appropriate benchmark. Second, the RTG sought to have Commerce consider the "Normal" rates as a benchmark to measure the benefits, if any, resulting from the 1% rate itself, which was being examined for countervailability on remand.

4. The reference in the title of the *Remand Determination* to USCIT Slip Opinion 04–91 is incorrect. Commerce's *Remand Determination* responded to the Court's order in USCIT Slip Opinion 06–117.

5. Commerce also considered alternative benchmarks, but ultimately rejected those as well. *See Remand Det.* 7–8 & 19. The RTG has never suggested that any alternative rates exist or would be appropriate benchmarks. In fact, in its comments to the *Remand Determination*, the RTG states that "[t]here are no such 'alternative' reduced rates as claimed by [Commerce], nor would it be proper for [Commerce] to try to create them." Pls.' Comments Dep't Commerce's Remand Results Pursuant to Slip Op. 06–117 at 8 ("Pls.' Br.").

6. "CIF value" refers to the total price of an import shipment including (1) cost of the goods, (2) insurance, and (3) freight.

determination: (1) a group of industries including the steel industry was a predominant user of the 1% rate; and (2) the steel industry itself received a disproportionate amount of the benefits flowing from the 1% rate. *Id.* at 6–8. Since either one of these findings would necessitate a finding of specificity, Commerce then concluded that the 1% rate was a specific subsidy and therefore was not suitable as a benchmark to measure the benefits resulting from the importing duty exemption programs. *Id.* at 30–31. Nowhere in the *Remand Determination* did Commerce present any analysis of why the 1% rate constitutes a subsidy. Finally, Commerce identified without explanation the 10% "Normal" rate as an acceptable benchmark and calculated the "estimated net countervailable subsidy rates under these [duty exemption] programs to be 5.85 percent and 0.91 percent, respectively." *Id.* at 31.

## II. *STANDARD OF REVIEW*

The Court must sustain any determination, finding, or conclusion made by Commerce in the *Remand Determination* unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a (b)(1)(B)(i).

■  With respect to the substantial evidence requirement, the U.S. Supreme Court has defined this term to mean "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *accord Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed.Cir.1984).

■  With respect to the in-accordance-with-law requirement, the Court must defer to an agency's reasonable construction of an ambiguous statute. *See Allegheny Ludlum Corp. v. United States*, 367 F.3d 1339, 1343 (Fed.Cir.2004) (*citing Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Further, "the deference granted to the agency's interpretation of the statutes it administers extends to the methodology it applies to fulfill its statutory mandate." *GMN Georg Muller Nurnberg AG v. United States*, 15 CIT 174, 178, 763 F.Supp. 607, 611 (1991) (citations omitted).

■■  The segregation of the two standards of review (supported by-substantial-evidence and in-accordance-with-law) serves to focus courts' attention on the dual agency function of legal interpretation and factual investigation. Ultimately, the two standards of review are both iterations of the broad requirement that an agency must not act arbitrarily or capriciously. *See Bangor Hydro–Electric Co. v. Fed. Energy Reg. Comm'n*, 78 F.3d 659, 663 n. 3 (D.C.Cir.1996); *accord Fujian Mach. and Equip. Imp. & Exp. Corp. v. United States*, 178 F.Supp.2d 1305, 1314, 25 CIT 1150, 1156 (2001). An agency acts arbitrarily and capriciously when it fails to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1984) (*quoting Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)).

## III. *DISCUSSION*

### A. Commerce's Treatment of the "Normal" Rates Must Be Internally Consistent

Countervailing duties are imposed on foreign products that are imported, sold,

or likely to be sold in the United States, where the foreign government is directly or indirectly subsidizing the manufacture, production, or export of that merchandise. *See* 19 U.S.C. § 1671(a); *Kajaria Iron Castings Pvt. Ltd. v. United States*, 156 F.3d 1163, 1165–66 (Fed.Cir.1998). The purpose of countervailing duties is to level the playing field in international trade by offsetting the unfair advantage that a foreign exporter receives through subsidies. *See Kajaria*, 156 F.3d at 1166; *Wolff Shoe Co. v. United States*, 141 F.3d 1116, 1117 (Fed.Cir.1998).

To achieve this purpose, Commerce must approximate the economic value that the foreign subsidy provides. *See Royal Thai III*, 441 F.Supp.2d at 1365. In order to gauge the economic value of a countervailable import duty exemption, as in this case, Commerce must determine the tariff rate that the enterprise would have paid absent the duty exemption. *Id.* at 1364. It is difficult to measure the benefit conferred by a duty exemption because import tariffs are inherently government constructions, and so there is no "prevailing market rate" for Commerce to use as a benchmark. *Id.* at 1365. Nonetheless, Commerce's analysis must be aimed at ascertaining the economic value of the benefit conferred.

■ In its *Remand Determination*, Commerce used the 10% "Normal" rate as a benchmark to calculate the countervailable subsidy rate with respect to the duty exemption programs. Earlier in that determination, though, Commerce had determined that looking to "Normal" rates was improper when analyzing the specificity of

the allegedly countervailable 1% rate. As noted in Part I.B, Commerce found that the "Normal" rates would not apply in the vast majority of cases. In other words, Commerce has determined that the "Normal" rate is an appropriate benchmark to calculate SSI's countervailable subsidy rate; but at the same time, and under the very same system of financial contribution, Commerce has determined that the "Normal" rates are not appropriate benchmarks to gauge the specificity of the 1% reduced tariff rate.

By using the "Normal" rate for steel slab, but rejecting the "Normal" rates for all other Thai industries, Commerce has created a distinction that requires explanation. *See Gen. Chem. Corp. v. United States*, 817 F.2d 844, 857 (D.C.Cir.1987) (remanding agency determination where agency's internally inconsistent analysis was never explained). Commerce has provided no reason for treating steel slab imports differently than all other Thai industries receiving the 1% rate. *Remand Det.* 2, 18–19. Steel slab, like the "vast majority" of Thai industries, is not a vulnerable industry to which the "Normal" rate would likely apply. *Verification Report* 5. Nevertheless, Commerce applied the "Normal" rate to steel slab in reliance on the RTG's representation that the "Normal" rate would apply to steel slab in the absence of the 1% rate. *Id.* Without a formal notification from the Thai Ministry of Finance[7], all HTS tariff designations would receive the "Normal" rate by default. *See Verification Report* 5; RTG Resp. 21 *(citing* Exs. 9 & 10 in response to Question 4). So all merchandise—not just steel slab—would revert to their "Normal"

---

7. The Ministry of Finance could impose tariff rates lower than the "Normal" rates by means of ministerial promulgations, which are known as "MOF Notifications." *See Verification Report* 4.

rates if their applicable reduced rates were suspended, or if the MOF notification for that rate expired. *Verification Report* 5; RTG Resp. 21 (*citing* Exs. 9 & 10 in response to Question 4). It is thus unclear why Commerce has decided to use steel slab's "Normal" rate to calculate the countervailing duty on SSI, but cannot use the "Normal" tariff rates to calculate the benefit conferred to Thai industries importing other merchandise at the 1% reduced tariff rate.

Commerce must decide whether the "Normal" tariff rates meaningfully relate to the economic value of the subsidy, or whether they are so irrelevant to the actual functioning of the Thai tariff regime that they must be excluded entirely from the benefit analysis. It is clear that the Thai system of import tariffs is complex and technical; it is for Commerce, and not this Court, to make a supported determination regarding the use of the "Normal" rates as benchmarks. *See* 19 U.S.C. §§ 1671d & 1677(1); 19 C.F.R. §§ 351.210 & 351.503(d) (2006). But Commerce may not treat two like situations differently without explanation. *Cf. NSK Ltd. v. United States,* 390 F.3d 1352, 1357–58 (Fed.Cir.2004) (rejecting as internally inconsistent a Commerce regulation interpreting "the price used to establish export price" in antidumping law); *Husteel Co., Ltd. v. Seah Steel Corp., Ltd.,* 31 CIT ——, ——, 491 F.Supp.2d 1283, 1290 (2007) (applying the NSK holding to Commerce's findings in a single antidumping proceeding).

Defendant-intervenor U.S. Steel offers the following explanation for the apparently inconsistent determinations: "At verification, RTG officials specifically stated with respect to slab, and only slab, that if the 1% reduced import duty rate was re-

scinded, the 'normal' rate of 10% would apply." Def.-Int. U.S. Steel Corp.'s Resp. Pl.'s Comments to Dep't Commerce Remand Det. 7 ("Def.-Int.'s Reply") (*citing Verification Report* 5). The cited *Verification Report* provides in pertinent part that:

> RTG officials explained that slab would have automatically reverted to its "Normal" rate of ten percent if these MOF Notifications had not been issued or had expired, since any "Reduced" rate other than one percent would require action on the part of the MOF to initiate and implement a new MOF Notification.

*Verification Report* 5. U.S. Steel is only half correct in its summation of this passage. While it is true that the passage can be read to support the proposition that the 10% "Normal" rate would apply to steel slab if the 1% rate were rescinded, Commerce addresses only steel slab in the passage, and never limits that analysis as applying "with respect to slab, and only slab." Def.-Int.'s Reply 7.

In fact, Commerce notes in the same paragraph that "RTG officials explained that an MOF Notification must be issued before a product can receive a 'Reduced' rate." *Verification Report* 5. Since steel slab was the only industry about which Commerce specifically inquired, Commerce only responded with respect to the steel industry. However, in formulating that response, the RTG was simply applying the general principle that since MOF Notifications alone operate to reduce tariff rates from the "Normal" rates, the "Normal" rate would have been the legally operative rate if no MOF Notification had ever implemented the 1% reduced rate. *See* Pls.' Br. 8–9 ("Indeed, [in the *Verification Report* ] the Department verified that if [the] 1% rate was not available, the

legally operative rate would be the normal rate clearly set forth in the tariff schedule."). Thus, U.S. Steel correctly asserts that the "Normal" rate would be legally operative for slab, but incorrectly asserts that slab is unique in this regard. Accordingly, the Court remands the issue so that Commerce may reconcile its findings regarding the applicability *vel non* of the "Normal" rates as benchmarks in Commerce's analysis.[8] As it stands, the disparate treatment of the "Normal" rates is arbitrary.

### B. Commerce Must Make Further Findings

A reconciliation of the inconsistency discussed in Part III.A will not complete Commerce's calculation of SSI's countervailable subsidy rate. In this section, the Court will endeavor to explain the consequences of Commerce's adoption or rejection of the "Normal" rates as benchmarks, and delineate the additional findings that the Court will require as a result of Commerce's findings.

### 1. If the "Normal" Rates Are Meaningful Benchmarks, Then Commerce Must Revise Its Specificity Methodology.

If Commerce determines that the "Normal" tariff rates are meaningful benchmarks then it must reverse its methodological decision to use CIF values instead of duty savings as a means of comparing the distribution of the 1% rate across industries. Otherwise, Commerce must explain its reasons for departing from its preferred policy.

As a preliminary matter, the deference due to Commerce's selected methodology

is unaffected by the Federal Circuit's previous decision in *Royal Thai II*. In *Royal Thai II*, the court granted Commerce latitude to measure the benefit conferred by a debt restructuring program. *See* 436 F.3d at 1336. The program, created in response to the Asian financial crisis of 1997, sought to identify major corporate debtors and offer a voluntary forum for restructuring negotiations that would bind all creditors. *Royal Thai I*, 29 CIT at ——, 341 F.Supp.2d at 1317–18. Commerce determined that the program was non-specific by measuring the distribution of the value of the debts being restructured. *Royal Thai II*, 436 F.3d at 1336. The Federal Circuit recognized that more favorable terms would confer greater benefits, but ultimately did not require Commerce to inquire into the specific terms of each loan because acquiring that information was "impracticable." *Id.* Indeed, the RTG did not have access to the terms of the private loans. Pls.' Br. 5.

In contrast, the current controversy is not over the practicability of conducting the proposed alternative analysis. The RTG has already provided the data necessary to analyze the duty savings. *See* RTG Resp., Ex. 9. Rather, the parties disagree over whether the "Normal" tariff rates provide a meaningful benchmark against which the reduced 1% tariff rate may be measured. *Royal Thai II* thus has no bearing on the present matter. The issue is then whether Commerce, having found that the "Normal" rates are appropriate benchmarks for the purposes of calculating the countervailable subsidy rate, is compelled to use the "Normal" rates in its specificity analysis, or if it may continue to use the CIF values as a proxy for its proportional benefit analysis.

---

**8.** Commerce itself has offered no explanation for its disparate treatment of the 10% "Nor-

mal" rate for steel slab and the "Normal" rates for other imported merchandise.

It is Commerce's own policy to use the relative level of actual benefits conferred to various industries when conducting a specificity analysis. *See Royal Thai II,* 436 F.3d at 1336 (" '[A]nalysis of whether an enterprise or industry or group thereof is a dominant user of, or has received disproportionate benefits under, a subsidy program should normally focus on the level of benefits provided,' even if sometimes 'it may be impracticable or impossible to determine the relative level of benefits.'") (*quoting Countervailing Duties: Final Rule,* 63 Fed.Reg. 65348, 65359 (Dep't Commerce Nov. 25, 1998) (final rule)). As applied to the present controversy, the policy would require Commerce to measure the actual savings provided by the import tariff reduction, unless acquiring that information is "impracticable."

As explained above, it is not impracticable for Commerce to incorporate the "Normal" rates into its specificity analysis. Having determined that they are appropriate benchmarks to measure the economic value of the reduced tariff rate, Commerce must either follow its preferred policy of conducting a relative benefit analysis, or it must explain its departure from its own precedent. *See Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973); *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States,* 29 CIT ——, ——, 412 F.Supp.2d 1330, 1336 (2005); *Allied Tube & Conduit Corp. v. United States,* 29 CIT ——, ——, 374 F.Supp.2d 1257, 1262 (2005) ("Commerce must explain why it chose to change its methodology and demonstrate that such change is in accordance with law and supported by substantial evidence.").

To be sure, the Court is mindful that it should not intrude into an agency's metho-dological prerogative without good reason. However, adopting the "Normal" rates as benchmarks in the specificity analysis will significantly transform the data and the conclusions that it may support. If Commerce measures the benefit conferred on Thai industries by the RTG's "relative benefits analysis," the steel industry's share of the benefit drops considerably. According to that analysis, the steel industry's share of the benefits flowing from the 1% reduced rate drops from 7.64 percent to 2.44 percent. *Remand Det.* 8; Pls.' Br. 8. The Court does not speculate as to whether Commerce will decide to group the steel industry with other industries to find predominant use, or whether Commerce will find disproportionate use despite steel's decreased proportion of benefits received. However, it is clear that such a transformation of the benefit distribution would merit further consideration from Commerce.

**2. If the "Normal" Rates Are Not Meaningful Benchmarks, Then Commerce Must Prove That the 1% Reduced Tariff Rate Is a Subsidy.**

If Commerce determines that the "Normal" tariff rates are *not* meaningful benchmarks, then it will have rightfully excluded them from its specificity analysis. However, under a finding of specificity alone, Commerce may not, as it has done here, discard the 1% reduced rate as a benchmark. Commerce must prove that the 1% reduced rate is a countervailable subsidy and it must do so without reference to the rejected "Normal" rates.

A subsidy exists when "an authority . . . provides a financial contribution . . . to a person and a benefit is thereby conferred." 19 U.S.C. § 1677(5)(B). As noted supra, such a subsidy is countervailable only

when it is specific. *See id.* § 1677(5)(A). There are thus three elements of a countervailable subsidy: (1) financial contribution; (2) benefit conferred; and (3) specificity. *See Delverde, SrL v. United States,* 202 F.3d 1360, 1365 (Fed.Cir.2000); 19 U.S.C. §§ 1677(5)(D) (defining "financial contribution"), 1677(5)(E) (defining "benefit conferred") & 1677(5A) (defining "specificity").

Commerce has not yet made any finding that the 1% tariff rate is a subsidy, nor did this Court in *Royal Thai III* express any opinion as to whether the 1% tariff met the other statutory requirements of a countervailable subsidy.[9] Thus, even if Commerce finds specificity, it will have prematurely rejected the 1% rate as a benchmark if it does so without the requisite finding that it is in fact a subsidy.

The consequence of rejecting the "Normal" rates as benchmarks, however, is that Commerce must then show that the 1% rate confers a benefit without reference to these now irrelevant "Normal" rates. If the rates are not meaningful benchmarks, such that their use would distort the specificity analysis, then any calculations that result from their use will similarly distort the calculation of SSI's countervailable subsidy. And unless Commerce can demonstrate that the 1% rate constitutes a benefit-conferring financial contribution without reference to the "Normal" tariff rates, it cannot find that the 1% rate is a subsidy. Finally, if Commerce is somehow able to prove that the 1% reduced tariff rate confers a countervailable benefit without reference to the "Normal" rates, and accordingly rejects the 1% rate as a benchmark, Commerce must then find a non-countervailable benchmark that is not the "Normal" rate.

## IV. CONCLUSIONS

The Court holds that Commerce's disparate treatment of the "Normal" rates is unsupported and arbitrary. Since the conclusions of the *Remand Determination* depended on that disparate treatment, the matter is remanded to the agency for reconsideration consistent with this opinion. On remand, Commerce must make one of three findings: (1) determine that the "Normal" rates are meaningful benchmarks to determine the economic value of the benefit conferred by any import tariff rate reduction or exemption; (2) determine that the "Normal" rates are *not* meaningful benchmarks to determine the benefit conferred by the tariff rate reductions or exemptions; or (3) distinguish steel slab from other Thai industries that receive the 1% reduced rate, to show that steel slab's "Normal" tariff rate of 10% is a meaningful benchmark to calculate the benefit conferred by the tariff rate reductions or exemptions, but that the other Thai industries' "Normal" rates are not similarly meaningful benchmarks. If Commerce makes the first finding, then it must accordingly adjust its specificity methodology or state its reasons for abandoning its precedent. If Commerce makes the second finding, then Commerce must prove the existence of a subsidy without reference to the "Normal" tariff rates. If,

---

9. In *Royal Thai III,* the Court included the following qualification to its remand:

    Because the Court's discussion herein is necessarily limited to specificity analysis (i.e., the apparent basis for agency decision-making), the Court expresses no opinion on whether the other statutory criteria for establishing the existence of a countervailable subsidy (including the presence of a financial contribution) have otherwise been met in this case.

    441 F.Supp.2d at 1366 n. 16.

under this second finding, it cannot prove the existence of benefit, then it cannot prove that the reduced rate is a countervailable subsidy, and it must use the 1% tariff rate as a benchmark to calculate the countervailable subsidy that SSI received through its import duty exemption programs. If Commerce makes the third finding, then it must make an affirmative finding that that the 1% tariff rate is a subsidy, and use the 10% rate to calculate SSI's countervailing duty.

## ORDER

Upon consideration of the *Results of Redetermination on Remand Pursuant to Royal Thai Government, et al. v. United States, Slip Op. 04–91 (Ct Int'l Trade July 27, 2004)* (May 4, 2007) ("*Remand Determination*"), Plaintiffs' Comments on the Remand Results, and the Responses to Plaintiffs' Comments filed by the Defendant and the Defendant–Intervenor, and upon all other papers and proceedings had herein, and upon due deliberation, it is hereby

**ORDERED** that the *Remand Determination* is further REMANDED to Commerce; and it is further

**ORDERED** that on remand Commerce must make one of the following three findings based on substantial evidence:

(1) The "Normal" rates are meaningful benchmarks to determine the economic value of the benefit conferred by any import tariff rate reduction or exemption;

(2) The "Normal" rates are *not* meaningful benchmarks to determine the benefit conferred by the tariff rate reductions or exemptions; or

(3) Steel slab may be distinguished from other Thai industries that receive the 1% reduced rate, such that steel slab's "Normal" tariff rate of 10% is a meaningful benchmark to calculate the benefit conferred by the tariff rate reductions or exemptions, but that the other Thai industries' "Normal" rates are not similarly meaningful benchmarks.

And it is further

**ORDERED** that Commerce must consider and explain the implications of the aforementioned findings as indicated in Part IV of the Court's August 6, 2007 Slip Op. 07–119.

**IT IS SO ORDERED.**